DREW, J.
 

 L Sherry Read, who sustained a back injury at work, appeals a judgment denying her claim for workers’ compensation benefits. AIG Insurance Company has answered the appeal, seeking reimbursement for workers’ compensation benefits that it
 
 *1192
 
 paid for an earlier knee injury sustained by Read.
 

 We affirm.
 

 FACTS
 

 In 2001, Read began working for Pel-State Oil Company, which operates convenience stores. Read was employed first as a cashier, then as an assistant manager. Read injured her left knee at work on August 28, 2002. AIG was Pel-State’s workers’ comp insurer at the time.
 
 [1]
 
 AIG paid weekly indemnity benefits of $228.14 to Read until August 22, 2005.
 

 On March 3, 2004, Read injured her back while attempting to free a barrel full of ice that had become stuck on a door threshold that Read had tried to roll the barrel across. Read sought medical treatment for her injured back and continued working at her job, but with a light-duty restriction.
 

 Read lost her job on May 5, 2004, because continued employment with Pel-State violated the company’s anti-nepotism rules. Read’s daughter was a district manager for Pel-State.
 

 Read filed a claim for compensation against Pel-State. An answer was filed by Pel-State and Bridgefield Casualty Insurance Company. Read amended her claim to add AIG as a defendant. Seeking reimbursement for benefits paid after March 4, 2004, AIG and Pel-State (in response to the [¡¡2002 accident) filed a cross-claim against Bridgefield. AIG and Pel-State (in response to the 2002 accident) also filed a third-party demand against Pel-State in which it was asserted that AIG incorrectly paid benefits to Read after September 1, 2003.
 
 [2]
 

 Following a trial on the merits, the WCJ rendered judgment dismissing: (i) Read’s claims for indemnity benefits and additional medical benefits against Pel-State and Bridgefield because of the March 2004 aggravation of her preexisting back injury; (ii) the cross-claim for reimbursement against Bridgefield; and (iii) the third-party demand against Pel-State.
 

 Read has appealed the denial of her claims. AIG and Pel-State (in response to the 2002 accident) answered the appeal on the issue of reimbursement from Bridge-field.
 

 DISCUSSION
 

 Read argues on appeal that the WCJ erred in denying her claim for indemnity benefits related to the 2004 accident and for additional medical benefits.
 

 An injured employee seeking temporary total disability (“TTD”) benefits must prove by clear and convincing evidence that he is physically unable to engage in any employment, regardless of its nature, including employment while working in pain. La. R.S. 23:1221(1);
 
 Lewis v. Chateau D’Arbonne Nurse Care Center,
 
 38,394 (La.App. 2d Cir.4/7/04), 870 So.2d 515. To prove a matter by clear and convincing evidence means to |,.¡demonstrate that the existence of a disputed fact is highly probable,
 
 ie.,
 
 much more probable than its nonexistence.
 
 Id.
 
 A claimant may prove disability through medical and lay testimony. The WCJ must weigh all of the evidence to determine if the claimant has met his burden of proving temporary total disability.
 
 Id.
 

 Under La. R.S. 23:1203, medical payments are separate and distinct from compensation indemnity benefits. A workers’
 
 *1193
 
 compensation claimant may recover medical expenses that are reasonably necessary for the treatment of a medical condition caused by a work-related injury. The plaintiff must prove the necessity of the treatment and the causal connection between the treatment and the employment-related accident by a preponderance of the evidence.
 
 Taylor v. Wal-Mart Stores, Inc.,
 
 40,179 (La.App. 2d Cir.9/21/05), 914 So.2d 579,
 
 writ not considered,
 
 2006-0144 (La.4/17/06), 926 So.2d 500,
 
 cert. denied,
 
 549 U.S. 1157, 127 S.Ct. 982, 166 L.Ed.2d 783 (2007).
 

 After Read injured her knee in 2002, she missed several weeks of work and underwent arthroscopic knee surgery. She had returned to her normal job duties as assistant manager by March 2004. As assistant manager, her job duties included running the store, meeting with delivery people, stocking shelves and coolers, keeping the store clean, and working the register. She routinely had to pick up cases of beer, drinks, and groceries.
 

 Read returned to work the day after her 2004 back injury, but testified that she could not do anything. Read was treated for her back injury on RMarch 9, 2004. She told the physician that her symptoms had completely resolved after an earlier lower back surgery, and that she had had no back symptoms since her surgery. The diagnosis was back and left leg pain due to lumbar radiculopathy. Suggested treatment was physical therapy, nonaddictive medication, and light-duty work. Read was directed to avoid repetitive bending or lifting more than 10 pounds. An MRI taken on March 26, 2004, showed mild degenerative changes at L2-3 and L5-S1.
 

 Read apparently did not miss any work at Pel-State after hurting her back, and she was essentially working full-time while doing light-duty work at the store when she was fired. Read applied for unemployment compensation after losing her job. She testified that she has not tried to find another job because her back pain has been so bad at times that she could not move. She added that her back was hurting during the two months that she worked before her termination.
 

 Read testified that her left knee had recovered enough by March 2004 that she would still be working but for her back injury. Read admitted that her preexisting back condition has caused occasional back flareups and problems since the late 1980s.
 

 Read has a well-documented medical history involving her lower back and left knee. Introduced at trial were Read’s medical records and the depositions of four physicians who had treated her.
 

 Read underwent a lumbar discectomy in 1988 after she hurt her back in a motor vehicle accident earlier that year. A 1991 MRI of the lumbar 1 ñspine showed desiccation at L4-5 and L5-S1, and a slight bulge at L4 and L5.
 

 In 1992, Read was referred to the Pain Management Service at LSU Hospital in Shreveport for treatment of low back and left lower extremity pain. Read reported to the doctors at LSU that the 1988 lumbar discectomy had provided relief for four months, but then the symptoms began recurring in the same distribution and quality and with increased intensity.
 

 Dr. William Bundrick, an orthopaedic surgeon, first treated Read’s left knee in April of 2003. Dr. Don Burt, Dr. Bun-drick’s partner, treated Read on September 18, 2003. It was noted during that visit that Read was having considerable pain in the low back and left hip that radiated into the left leg. Read told Dr. Burt that she was doing well until she had to lift some heavy material at work. Dr. Burt’s impression was nerve root irritation
 
 *1194
 
 possibly secondary to recurrent disc herniation at the L5-S1 level. Read was given a cortisone injection in her back and was told to rest for a few days.
 

 When Dr. Bundriek treated Read on November 11, 2003, pain in the lower back and down the left leg appeared to be the predominant factor at the time. Dr. Bun-drick testified that he does not treat patients for back injuries, and was treating Read only for her left knee. After examining Read on January 12, 2004, Dr. Bun-drick believed that the left knee pain she was experiencing on attempted extension of the knee with the hip flexed was coming from nerve root irritation in her back. There was no mention of |fiher back pain in the records from Read’s last two visits with Dr. Bundriek, which were on April 29 and August 10 of 2004.
 

 Dr. Carl Goodman, an orthopaedic surgeon, treated Read in 2004. In Dr. Goodman’s opinion, Read had probably experienced an aggravation of her lumbar disc syndrome in March of 2004. He first treated Read on April 13. She complained primarily of low back pain with burning and tingling in her left leg. An X-ray and a MRI showed degenerative disc changes at L5 with mild midline disc bulge. Dr. Goodman’s impression was lumbar strain and sprain with degenerative lumbar disc disease. Dr. Goodman remarked that the lumbar strain and sprain was an acute finding, and the degenerative disease was preexisting. He limited Read to light-duty work, and expected gradual improvement over the next six weeks.
 

 Read returned to Dr. Goodman on April 20 with increased back and left leg pain. She reported that she had been unable to work on April 19 or April 20. Dr. Goodman recommended that she return to work the next day with the same light-duty restriction. He prescribed a six-day treatment of Cortisone tablets.
 

 When Read was treated by Dr. Goodman on May 4, she reported having some improvement in her back and left leg. Dr. Goodman’s impression at that time was a resolving low back syndrome. The next day, Read called Dr. Goodman’s office with complaints of being in a lot of pain. Ul-tram, a pain reliever, was prescribed for her.
 

 Read next saw Dr. Goodman on June 3. Her complaints were increased back and left leg pain, and she had not improved since her last |7visit. Dr. Goodman thought this was the same pain that Read had complained about a month earlier. His impression was lumbar strain and sprain, and his recommendation was to continue with light-duty work. Home exercises were discussed.
 

 Read called Dr. Goodman’s office on July 20. She reported that her back went out, she wanted to be referred to a doctor in Texas where she had moved, and she wanted a prescription called in. Dr. Goodman last treated Read on July 26. She had increased back and left leg complaints, with her primary complaint being low back pain with sciatic type pain down to the mid left calf. Dr. Goodman thought these were the same complaints as earlier, and that she was doing about the same as before. His impressions were lumbar strain and sprain, and degenerative lumbar disc disease. Dr. Goodman noted that he could find no objective abnormalities to explain her continued pain and disability; however, he was not suggesting that she was exaggerating her symptoms. He told her that he had no further treatment to offer, and that she could continue to do light-duty tasks at work.
 

 On August 11, 2004, Read underwent a medical examination to determine her fitness to be a commercial driver. On a form she filled out, she reported the March 2004
 
 *1195
 
 back injury, but she checked “No” to “Chronic low back pain” in the Health History section of the form. Read passed the physical exam. Dr. Frederick Price, who performed the exam, believed that he examined Read for a return to work physical, and did not know why a Department of Transportation (“DOT”) form was completed. He explained that Read received a certification that she could drive. Read could not recall |sif the reason she had the examination was to obtain DOT certification or to return to work in another capacity. Dr. Price obtained a release to full duty with no restrictions from Dr. Goodman.
 

 Dr. Gerald Foox, who specialized in or-thopaedic medicine and pain management, began treating Read’s left knee on August 27, 2004. During this visit, Read did not complain about back pain, and her back was not specifically examined.
 

 Dr. Foox first treated Read for her back problem on September 24, 2004. She indicated that the March 2004 accident did not cause a flareup, but caused a new injury to the lower back. She told Dr. Foox that her back pain had been constant since the accident; however, he questioned this based on his August 2004 exam and the physical done by Dr. Price.
 

 Dr. Foox’s first impression was lumbar syndrome, but his impression later changed to internal disc disruption syndrome because based on an MRI, he suspected that there was an internal problem in the L5-S1 disc.
 

 Dr. Foox agreed it was possible that his treatment of Read through June of 2005 was related to a flareup of her chronic back condition instead of the March 2004 accident. He did not know of anything in her history or from his examinations that suggested that anything other than flareups was causing her complaints of back pain during the period that he treated her. Dr. Foox agreed that the 1988 discectomy made her more prone to flareups or aggravations caused by incidents, but he was unaware if the surgery was in the area of L5-S1. Dr. Foox believed that any aggravation of her chronic back condition caused by the March 2004 accident had resolved at the time 19of the August 2004 examination by Dr. Price. In June of 2005, Dr. Foox assigned a whole person impairment rating of 4% to Read based only on the left knee condition.
 

 Dr. Foox testified that because of Read’s back condition, he would have restricted the amount of lifting, bending, stooping, and squatting that she did. Dr. Foox agreed that at the time his deposition was taken, he did not have sufficient information to say whether or not Read could work.
 

 Read presented at the emergency room at LSU Hospital on September 27, 2005, with complaints of pain in her low back with sharp pain radiating down her left leg to her foot. She reported that the severity of the radicular symptoms had increased over the last few days, and that she had had chronic back pain since her 2004 accident. The diagnosis was back strain. Read returned to LSU’s ER on March 16, 2006, with complaints of low back pain that had worsened over the last three months. The diagnosis was lumbosacral neuritis.
 

 Dr. Goodman mentioned that patients who have had lumbar disk surgery are more susceptible to flareups or incidents of back pain. He agreed that flareups experienced by Read would be consistent with someone who had a chronic lumbar disk syndrome.
 

 Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review.
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840
 
 *1196
 
 (La.7/1/97), 696 So.2d 551. In applying the manifest error-elearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but linwhether the fact finder’s conclusion was a reasonable one.
 
 Id.
 
 When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own inferences and evaluations are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989);
 
 Arceneaux v. Domingue,
 
 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993).
 

 The trial court correctly found that Read failed
 
 to
 
 establish by clear and convincing evidence that she was temporarily and totally disabled at any time after the March 2004 accident. Read worked for nearly two months after the accident, her termination was unrelated to her injury, she applied for unemployment compensation, and she has not looked for work elsewhere.
 

 Based upon our review of this record, we cannot conclude that the trial court was clearly wrong in denying indemnity benefits and additional medical expenses. We also find no error in the denial of AIG’s reimbursement claim.
 

 CONCLUSION
 

 At appellant’s costs, the judgment is AFFIRMED.
 

 [1]
 

 . AIG provided coverage until August 31, 2003.
 

 [2]
 

 . A physician treating Read in 2004 recorded in her medical history that she had injured her left knee at work in September of 2003.