GASKINS, J.
 

 11 This is a workers’ compensation dispute between American Interstate Insurance Company (AI) and The Gray Insurance Company (Gray), the insurers of Cellxion, Inc. (Cellxion). AI insured Cellx-ion until September 27, 2000, and Gray insured Cellxion thereafter. Cellxion’s employee, Vickie Fuentes, suffered a shoulder injury in June 2000. She had two surgical procedures on the shoulder. In 2002, Ms. Fuentes developed carpal tunnel syndrome (CTS) and later had surgery for that condition. She then developed reflex sympathetic dystrophy (RSD) in the arm. Fuentes sued Cellxion, AI, and Gray for workers’ compensation benefits. She settled with AI, releasing AI, Cellxion, and Gray. Gray and AI filed various cross-claims for recovery of amounts paid to Fuentes. Cellxion/Gray contended that all Ms. Fuentes’ problems arose from the shoulder injury. AI claimed that some of the problems were caused by CTS and Cellxion/Gray should reimburse it for a portion of the medical expenses and indemnity paid to Ms. Fuentes, as well as one-half the amount of the settlement.
 

 The Office of Workers’ Compensation (OWC) found that the CTS was a separate injury and not related to the shoulder injury. It also found that the RSD was caused by both the shoulder injury and the CTS. The OWC denied Cellxion/Gray’s claim against AI to recover amounts paid to Ms. Fuentes arising from the CTS. AI’s third party demand for all indemnity benefits paid to Ms. Fuentes during the recovery period for the CTS surgery was granted. The OWC also ordered Cellxion/Gray to pay one-half of the indemnity payments and medical benefits made to Ms. Fuentes for her RSD. AI’s claim to recover one-half of the settlement amount from Cellx-ion/Gray |2was denied. Cellxion/Gray appealed and AI has answered the appeal. For the following reasons, we affirm in part and reverse in part, the judgment of the OWC.
 

 FACTS
 

 The plaintiff, Vickie Fuentes, began working at Cellxion on July 11, 1999, as a mechanical technician. Cellxion manufactures telecommunications buildings. On June 9, 2000, she injured her left shoulder. At that time, Cellxion was insured by AI. On February 20, 2001, Ms. Fuentes had surgery, performed by Dr. Michael Aeurio, on the shoulder for a torn rotator cuff. She continued to have problems with the left shoulder.
 

 On April 2, 2001, Ms. Fuentes returned to work as a quality control inspector. This was light duty work. In July or August 2002, she changed jobs to a position that was considered even lighter duty. At some point, she moved to another posi
 
 *1048
 
 tion which required the repetitive use of small hand tools.
 

 On December 17, 2002, Ms. Fuentes injured her left wrist and was diagnosed with CTS. On June 30, 2003, Ms. Fuentes had a second surgery on her left shoulder performed by Dr. Neil Maki. In July 2003, Ms. Fuentes was terminated by Cellxion. On November 17, 2004, Ms. Fuentes had surgery for CTS by Dr. John Ferrell. Ms. Fuentes then developed RSD in the left arm and was treated by a pain management physician, Dr. Randall Brewer.
 

 |aAI paid medical and indemnity benefits for the left shoulder surgeries. Gray paid for the CTS surgery. However, AI paid indemnity benefits during the recuperative period for the CTS surgery.
 

 Ms. Fuentes filed a disputed claim for workers’ compensation in January 2004. Cellxion/Gray filed a third party demand against AI to recover for amounts paid for the CTS surgery, contending that the CTS was caused by the shoulder injury. AI filed a reconventional demand against Cellxion/Gray claiming that the CTS was a separate injury, denying liability, and seeking reimbursement for indemnity and medical amounts paid for the CTS. AI later filed a supplemental and amended reconventional demand claiming that Ms. Fuentes’ disability was caused by a combination of the shoulder injury and CTS; therefore, AI and Cellxion/Gray should pay their proportional share of all the workers’ compensation benefits paid by AI.
 

 The matter was heard by the OWC on March 12, 2008. At the hearing, AI and Ms. Fuentes entered into a settlement for $120,000. Cellxion, as Ms. Fuentes’ employer, approved the settlement. The hearing continued on the cross-claims between AI and Cellxion/Gray. On April 18, 2008, the OWC entered an oral ruling on the record. It found that the CTS was a separate injury which occurred in 2002 while Cellxion was insured by Gray.
 
 [1]
 
 The RSD which Ms. Fuentes developed after the CTS surgery was found to be a result of both the shoulder and the CTS injury. The OWC found that AI paid all it owed for the shoulder injury. Cellxion/Gray paid for the CTS surgery, but not the post-surgery indemnity. Therefore, it owed | reimbursement to AI for that expense. The OWC found that Cellxion/Gray owes AI 50 percent of the indemnity, medical and rehabilitation benefits paid for the RSD. According to the OWC, the settlement was a compromise and not a lump sum settlement; therefore it had no authority to order Cellxion/Gray to reimburse AI for one-half of the $120,000 compromise settlement.
 

 On July 11, 2008, the OWC entered judgment denying the third party demand by Cellxion/Gray against AI. The third party demand by AI against Cellxion/Gray was granted, ordering Cellxion/Gray to pay $2,896.80 in indemnity for the recovery period following the CTS surgery; $25,036.63, which is one-half the indemnity payments arising from the RSD; $16,083.45, which is one-half of the medical benefits attributable to the RSD; $1,415.65, which is one-half the vocational rehabilitation, as well as costs and interest from the date of judicial demand, April 6, 2006. AI’s demand for reimbursement for one-half of the settlement with Ms. Fuentes was denied. Cellxion/Gray appealed and AI answered the appeal.
 

 CELLXION/GRAY’S APPEAL
 

 Cellxion/Gray alleges that the OWC erred in denying its third party demand against AI for reimbursement for medical
 
 *1049
 
 expenses paid by Cellxion/Gray on behalf of Ms. Fuentes arising from CTS. Cellx-ion/Gray also maintains that the OWC erred in ruling that Cellxion/Gray is responsible for indemnity benefits paid to Ms. Fuentes for the 12 weeks following the CTS surgery. These arguments are without merit.
 

 |
 
 ¡¡CTS Medical and Indemnity Benefits
 

 Cellxion/Gray argues that Ms. Fuentes’ shoulder injury caused her CTS and therefore, AI should reimburse Cellx-ion/Gray for medical benefits it paid for Ms. Fuentes’ CTS surgery. Cellxion/Gray contends that the OWC erred in ruling otherwise. Cellxion/Gray also objects to the OWC ruling ordering it to reimburse AI for the 12 weeks of indemnity benefits AI paid while Ms. Fuentes was recuperating from CTS surgery. Cellxion/Gray claims that when Ms. Fuentes had CTS surgery, she was under a light duty work restriction due to her shoulder. She was drawing workers’ compensation benefits from AI at that time for her shoulder disability. Cellxion/Gray claims that it should not be required to pay indemnity benefits for a time when Ms. Fuentes was already off work for her shoulder condition. Decision of these issues turns on an examination of the testimony, both medical and nonmedical, in this case concerning whether the shoulder injury caused the CTS.
 

 In a workers’ compensation case, as in other cases, the appellate court’s review is governed by the manifest error or clearly wrong standard. Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the OWC judge. Unless shown to be clearly wrong, the trial court’s factual findings of work-related disability will not be disturbed where there is evidence which, upon the trier of fact’s reasonable evaluation of credibility, furnishes a reasonable, factual basis for those findings. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be | (¡disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
 
 Gilbert v. Willis-Knighton Workkare Clinic,
 
 44,628 (La.App.2d Cir.9/2/09), 20 So.3d 1149;
 
 Kendrick v. Solo Cup,
 
 44,303 (La.App.2d Cir.6/3/09), 15 So.3d 295.
 

 Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Read v. Pel-State Oil Company,
 
 44,218 (La.App.2d Cir.5/20/99), 13 So.3d 1191;
 
 Koenig v. Christus Schumpert Health System,
 
 44,244 (La.App.2d Cir.5/13/09), 12 So.3d 1037;
 
 Lemons v. Georgia Pacific Corporation,
 
 42,950 (La.App.2d Cir.2/13/08), 976 So.2d 307,
 
 writs denied,
 
 2008-0587 (La.5/2/08), 979 So.2d 1288, 2008-0590 (La.5/2/08), 979 So.2d 1289. The courts have consistently held that the manifest error standard applies upon appeal in workers’ compensation actions, even though the evidence before the trier of fact may consist solely of written reports, records, and depositions.
 
 Alexander v. Brookshire Grocery Co.,
 
 42, 855 (La.App.2d Cir.1/9/08), 975 So.2d 100,
 
 writ denied,
 
 2008-0503 (La.4/25/08), 978 So.2d 367.
 

 Ms. Fuentes testified that she injured her left shoulder in June 2000. She had physical therapy for the shoulder. At that time, the notes of the physical therapist, Mark Hart, indicate that, among her symptoms, Ms. Fuentes complained of numbness and tingling in her fingers. However, in her testimony at the hearing, Ms. Fuentes said that in 2001, when she had her first shoulder surgery, she had pain from her shoulder, but not from her wrist.
 

 
 *1050
 
 |7Ms. Fuentes had surgery for a torn rotator cuff in February 2001, performed by Dr. Michael Acurio. She was off work for about six weeks. After she returned to work at Cellxion in 2002, following the first shoulder surgery, Ms. Fuentes was eventually placed in a job which required her to use her wrist more. While working in this job, she suffered an injury to her left hand. Ms. Fuentes stated that on December 17, 2002, she picked up a drill and lost feeling in her left hand. She was then moved to a lighter duty job.
 

 After the initial shoulder surgery, the shoulder continued to hurt. Dr. Acurio opined that she had some instability in the shoulder. In February 2003, Ms. Fuentes was referred to Dr. John Ferrell for a second opinion. It was determined that a second shoulder surgery was necessary and Ms. Fuentes was referred to Dr. Neil Maki for the surgery.
 

 Dr. Maki first saw Ms. Fuentes on May 14, 2003. He recommended surgery to stabilize and debride the shoulder. This surgery was performed on June 30, 2003. In August 2003, Dr. Maki saw Ms. Fuentes for a follow-up visit and found that her range of motion was less than expected at that time. He noted that she also had CTS. In August 2003, Dr. Maki released Ms. Fuentes to light duty work, noting that she had atypical forearm pain which was probably not related to CTS.
 

 In his deposition, Dr. Maki was questioned about the tingling and paresthesia with regard to whether it was attributable to the shoulder or to |8CTS.
 
 [2]
 
 Dr. Maki stated that occasionally, if a patient has an unstable shoulder, it can cause pulling and irritation on the nerve roots. However, in Ms. Fuentes’ case, it was difficult to delineate. Dr. Maki stated that paresthesia can be caused by CTS, but most people just have pain up and down the arm. He said that Ms. Fuentes was doing fine after the second shoulder surgery, so he did not think that the shoulder instability was causing her pain complaints.
 

 Dr. Maki was asked to assume that Ms. Fuentes had no problems with her wrist after the first shoulder surgery and developed problems with the wrist after she was assigned a job requiring the use of small hand tools. He was then asked whether, under those circumstances, the CTS was caused by the repetitive movements of her job or by her shoulder injury. Dr. Maki said that if Ms. Fuentes had no problems or complaints with her wrist until 2002, then more likely than not, the CTS was related to her job activities which began about that time. Dr. Maki also said that he did not find anything with regard to the present condition of Ms. Fuentes’ shoulder that could be causing her problems with CTS. Dr. Maki noted that Ms. Fuentes continues to have swelling, clunking, and ganglion cysts in her wrist. He said that these symptoms would not have been caused by the shoulder injury.
 

 Dr. John Ferrell saw Ms. Fuentes in February 2003 for a second opinion after she continued to have pain following her initial shoulder surgery. He later treated her for CTS. He performed surgery on her wrist on | ¡¡November 17, 2004. She was not able to work for several weeks following the surgery. Dr. Ferrell noted that, after the surgery, Ms. Fuentes continued to have “popping, clunking, and swelling” of the wrist. An MRI performed in 2005 revealed a healthy median nerve with a lot of fluid in the distal radial ulnar joint. Dr. Ferrell observed that Ms. Fuentes first
 
 *1051
 
 began having pain and numbness in her upper arm and hand in October and November 2000, shortly after the initial shoulder injury. He opined that the CTS was related to the original shoulder injury. However, he also stated in an early doctor’s note in 2004 that the second lighter duty job performed by Ms. Fuentes caused the CTS.
 

 The record shows that, following the shoulder surgery, Ms. Fuentes denied having symptoms of CTS until the specific accident at work in December 2002 when she was using small hand tools. Dr. Maki, who performed her second shoulder surgery, did not think the shoulder injury caused the CTS. Dr. Ferrell stated in his deposition that he thought there was a connection between the shoulder injury and the CTS. However, earlier he had stated that he felt that the CTS was caused by Ms. Fuentes’ repetitive use of small hand tools in a job different from the one she was doing when she injured her shoulder.
 

 The record is sufficient to support the conclusion of the OWC that the shoulder injury and the CTS were two separate and unrelated injuries. Because the CTS occurred while Celbdon was insured by Gray, the OWC was not manifestly erroneous or clearly wrong in denying Cellxion/Gray’s claim to recover medical benefits paid for the CTS surgery and in ordering | mCellxion/Gray to pay for Ms. Fuentes’ indemnity benefits during her recuperation from the CTS surgery.
 

 RSD Benefits
 

 Cellxion/Gray claims that the OWC erred in taxing them with one-half of the indemnity, medical and vocational rehabilitation benefits AI paid Ms. Fuentes arising from her RSD, based upon the finding that the shoulder injury and the CTS combined to cause the RSD. This argument is without merit.
 

 Following her surgeries, Ms. Fuentes continued to complain of diffuse pain in the upper left extremity. A functional capacity evaluation (FCE) was done on Ms. Fuentes by Dr. Austin Gleason on July 12, 2005. He noted weakness in her shoulder and wrist. According to Dr. Gleason, he could not determine whether the weakness in Ms. Fuentes’ arm was due to her shoulder or CTS. Dr. Gleason assigned an impairment rating to Ms. Fuentes for her shoulder and wrist injuries. Dr. Gleason split her impairment rating in half, giving 3 percent impairment rating to the total body for weakness due to the shoulder and 3 percent for weakness secondary to CTS. He assigned a 1 percent impairment to the body as a whole for loss of motion of the shoulder, giving her a 4 percent impairment to the body as a whole for her shoulder injury.
 

 On September 30, 2005, Dr. Benjamin Nguyen, a neurologist, did a nerve conduction study on Ms. Fuentes at the request of Dr. Ferrell. This test of the left upper extremity showed mild prolonged distal latency of the median sensory response across the wrist. Other motor and sensory nerve ^conduction studies on the left arm were found to be normal. Dr. Nguyen’s findings were consistent with a mild CTS with no significant evidence of dener-vation.
 

 Dr. Ferrell’s notes show that in October 2005, Ms. Fuentes was diagnosed with RSD. Dr. Ferrell stated that the problems Ms. Fuentes is currently having with RSD are caused by her shoulder and not by her wrist. According to Dr. Ferrell, the CTS does not have anything to do with the RSD. He claimed that the popping, clunking, and swelling that Ms. Fuentes is currently experiencing in her left arm is due to RSD and not CTS.
 

 
 *1052
 
 Regarding the RSD, Dr. Maki stated that most dystrophy involves swelling, col- or and temperature change and loss of motion. Ms. Fuentes did not have the classic symptoms of dystrophy. She had complaints of paresthesia and nerve pain. According to Dr. Maki, when a patient experiences pain out of proportion to what is appropriate for the pathology, it is felt to be related to the transmission of and perception of nerve pain syndrome. Ms. Fuentes had deltoid atrophy indicating that she may not have had full rehabilitation or a full recovery from her shoulder problem.
 

 Dr. Ferrell referred Ms. Fuentes to Dr. Randall Brewer, a pain management specialist, for a cervical sympathetic nerve block. In Dr. Brewer’s deposition, he noted that he first saw Ms. Fuentes on December 1, 2005. Dr. Brewer stated that Ms. Fuentes had left wrist pain radiating to the shoulder and independent shoulder pain. Ms. Fuentes stated that she had a work-related shoulder injury and later developed CTS. After CTS surgery, she continued to have shooting and stabbing pain in her arm. According to |12Pr. Brewer, the left wrist was the source of Ms. Fuentes’ predominant complaint of pain.
 

 Dr. Brewer stated that he did not find significant problems with skin sensitivity in the left arm. Ms. Fuentes was protective of the arm. However, her reflexes were normal. She had mild loss of sensation over the index finger of the left hand. Dr. Brewer did not detect that movement of Ms. Fuentes’ neck caused pain and passive motion of the shoulder did not reproduce her symptoms of pain.
 

 He did note that there was a discrepancy in the temperature of the arms with the left arm being colder than the right. Dr. Brewer stated that if one is looking at a diagnosis of nerve pain and one is thinking about RSD, which is known as complex regional pain syndrome, the difference in temperatures implies that the sympathetic nerves in the left arm are slightly more active than the nerves in the right. Dr. Brewer noted that the nerve conduction test done by Dr. Nguyen indicated a problem with the median nerve in Ms. Fuentes’ wrist. Dr. Brewer thought that the most disabling part of Ms. Fuentes’ neuropathic pain was coming from the wrist. On three separate occasions, Dr. Brewer administered injections into Ms. Fuentes’ neck to block the sympathetic nerves in her arm. He stated that she had good response to the nerve blocks.
 

 When questioned about his statement that Ms. Fuentes’ pain began in the wrist and radiated up the arm, Dr. Brewer said that he thought Ms. Fuentes may have concomitant pain in the shoulder, not coming from the wrist, that was more mechanical in quality. According to Dr. Brewer, | ^patients can develop RSD because of CTS. In Ms. Fuentes’ case, Dr. Brewer stated that her pain could be coming from the wrist or shoulder, or both.
 

 An electrodiagnostic examination performed by Dr. David N. Adams on November 12, 2007, revealed no nerve abnormalities or CTS in the upper left extremity.
 

 Although there is conflicting medical testimony as to the cause of Ms. Fuentes’ RSD, the bulk of the testimony supports the conclusion by the OWC that the RSD was caused by a combination of the shoulder and wrist injuries. Dr. Gleason attributed Ms. Fuentes’ disability one-half to the shoulder injury and one-half to the wrist. Dr. Maki outlined the symptoms of the nerve pain that Ms. Fuentes has. He noted that she did not have the classic symptoms of dystrophy and that she continues to have problems with her wrist that are not caused by the shoulder injury.
 

 
 *1053
 
 Dr. Ferrell, who operated on Ms. Fuentes’ wrist, insisted that the RSD was completely caused by the shoulder and not the wrist. However, the record is clear that, even after the CTS surgery, Ms. Fuentes continued to have difficulty with her wrist. She complained of swelling, popping, and clunking.
 

 Dr. Brewer, who treated Ms. Fuentes for her RSD pain, felt that the cause of this problem was a combination of the wrist and the shoulder.
 

 Cellxion/Gray contends that Dr. Ferrell was Ms. Fuentes’ treating physician and his opinion should be given more weight than that of the other doctors. The general rule is that the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient |14only once or twice. However, the treating physician’s testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses.
 
 Kendrick v. Solo Cup, supra, Frye v. Olan Mills,
 
 44,192 (La.App.2d Cir.4/8/09), 7 So.3d 201. Dr. Ferrell treated Ms. Fuentes’ -wrist and Dr. Maki was the treating physician for Ms. Fuentes’ shoulder. Dr. Brewer was the treating physician for the symptoms of RSD. Under these facts and the record before us, we find that the OWC was not clearly wrong in holding that the RSD was caused by both the shoulder and the wrist injury and in dividing the indemnity, medical, and vocational rehabilitation benefits equally between AI and Cellxion/Gray. This conclusion is supported by the testimony of Dr. Maki and Dr. Brewer. It is corroborated by Dr. Gleason’s finding that Ms. Fuentes’ disability is attributable one-half to her shoulder and one-half to her wrist. It is further supported by Dr. Nguyen’s nerve conduction study which found some mild continuing problems -with Ms. Fuentes’ wrist.
 

 Cellxion/Gray objects to the view that there is a solidary obligation between it and AI for benefits arising from RSD. If an employee in a workers’ compensation claim suffers disability due to the combination of two incidents or by virtue of the second incident aggravating the injury suffered in the first incident, both the subsequent compensation insurer and the insurer at the time of the first incident are solidarity liable for compensation benefits and medical expenses.
 
 Rave v. Wampold Companies,
 
 2006-978 (La.App. 3d Cir.12/6/06), 944 So.2d 847;
 
 Abadie v. Marsiglia Construction Company,
 
 2002-2108 (La.App. 4th Cir.4/9/03), 845 So.2d 564,
 
 writ denied,
 
 2003-1182 (La.6/20/03), 847 So.2d 1233;
 
 Daigle v. Lajet, Inc.,
 
 504 So.2d 1126 (La.App. 5th Cir.1987). See also
 
 Tron v. Little Italiano, Inc.,
 
 38,556 (La.App.2d Cir.6/25/04), 877 So.2d 1055.
 

 Therefore, because there was a showing that the RSD was attributable to both the wrist and shoulder injuries, the OWC did not err in finding that AI and Cellx-ion/Gray were each responsible for the indemnity, medical benefits, and vocational rehabilitation arising from the RSD. Further, we reject Cellxion’s argument that AI could not recover from Cellxion because AI is Cellxion’s insurer. Cellxion was not insured by AI for the wrist injury. As stated above, the wrist injury was separate from the shoulder injury. This injury occurred while Cellxion was insured by Gray and had a $50,000 deductible. The OWC property found that AI and Cellx-ion/Gray were each liable for one-half of the benefits attributable to Ms. Fuentes’ RSD.
 

 ATS ANSWER TO THE APPEAL
 

 AI answered the appeal, arguing that the OWC erred in refusing to require that Cellxion/Gray reimburse AI for one-half of the settlement paid to Ms. Fuentes.
 
 *1054
 
 AI contends that the counsel for Cellx-ion/Gray took part in the settlement negotiations and, as a result of the settlement, Cellxion/Gray was released from liability to Ms. Fuentes. AI points out that the OWC made a distinction between a lump sum settlement and a compromise settlement. The OWC then determined that, because this was a compromise, it had no authority to order Cellxion/Gray to reimburse AI for one-half of the settlement amount. AI argues that this distinction is immaterial and no statutory authority exists to support the conclusion that the OWC is without | ¶(¡authority to order reimbursement for one-half of the settlement. AI contends that, because the OWC found that Cellxion/Gray was responsible for one-half of the indemnity and other benefits for Ms. Fuentes’ condition, it should also be liable to AI for one-half of the settlement. According to AI, under ordinary notions of equity, Cellxion/Gray should pay one-half of the settlement. This argument has merit.
 

 The Louisiana Civil Law Treatise on Workers’ Compensation explains the distinction between a lump sum settlement and a compromise:
 

 A “lump sum settlement” (which probably should have been called a “lump sum payment”) is not a compromise of disputed issues between the employee and the employer. Rather, it is an agreement between them to pay sums admittedly due — and otherwise payable in weekly amounts — in a lump sum discounted to present value within statutory restrictions. A “compromise”, on the other hand, is an agreement between the employee and the employer to resolve disputes between them (such as work-relation of the injury or extent of disability) by the payment of compensation, very often in a single amount. Due to the fact that their dispute is being resolved by compromise, the agreed amount — though paid in a lump sum — is not subject to the restrictions placed on “lump sum settlements.”
 

 [[Image here]]
 

 La. R.S. 23:1274 provides a method by which the employer and employee may agree that compensation which is admitted to be due shall be paid in a lump sum rather than distributed over a period of weeks. This section contemplates that the employee shall receive the full amount of compensation to which he is entitled under the Act, subject only to a discount not in excess of 8%. The agreement is not valid until it has been approved by a “hearing officer” (presumably now the workers’ compensation judge). Thereafter, upon payment of the sum agreed to, the liability of the employer is satisfied.
 

 [[Image here]]
 

 As we have noted earlier, though both require judicial approval, the compromise is not to be confused with the lump sum |17settlement. Whenever there exists a bona fide dispute, the parties are authorized to enter into a compromise agreement which, upon being approved by the workers’ compensation judge, is reduced to judgment. When this has been done, the judgment cannot be set aside except for fraud or misrepresentation. The cases, however, have given this rule a rather narrow interpretation, declining to extend a compromise to future accidents or injuries, or when the six-month period after the termination of temporary total disability had not been respected, or when there are other problems.
 

 The compromise derives its validity from the existence of differences between the parties, and its purpose is to offset the fear of loss by the chance of gain. The lump sum settlement, on the other hand,
 
 *1055
 
 is proper when there are no differences between the parties; and the sole purpose of the arrangement is to avoid continuous weekly payments. [Footnotes omitted.]
 

 14 H. Alston Johnson, III, Workers’ Compensation Law and Practice (Louisiana Civil Law Treatise) § 387 (4th ed. 2002).
 

 We have established that the defendants are solidarily liable in that each is responsible for the indemnity, medical benefits, and vocational rehabilitation arising from the K.SD. La. C.C. art. 1804 provides:
 

 Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obli-gor.
 

 A solidary obligor who has rendered the whole performance, though subrogated to the right of the obligee, may claim from the other obligors no more than the virile portion of each.
 

 If the circumstances giving rise to the solidary obligation concern only one of the obligors, that obligor is liable for the whole to the other obligors who are then considered only as his sureties.
 

 118Since AI and Cellxion/Gray are solidary obligors and AI rendered the whole performance, AI may claim the virile portion, or one-half, from Cellxion/Gray.
 

 The case of
 
 Maryland Casualty v. Liberty Mutual Insurance Co.,
 
 254 La. 489, 224 So.2d 465 (La.1969), addressed the question of whether a workers’ compensation compromise settlement can form the basis for fixing the indebtedness of a third party as a solidary obligor. The court concluded that the settlement by the general employer’s insurer may be the basis for a demand for contribution under a solidary obligation against the insurer of a special employer.
 

 In
 
 Maryland Casualty,
 
 the employee worked for a company that leased equipment and workers to other companies. The employee was injured while working for the special employer. The insurer of the general employer settled with the employee and sought to recover one-half of the settlement from the special employer. The supreme court found that the demand was proper and held that the general employer and the special employer were soli-dary obligors. The insurer of the general employer was allowed to claim contribution of one-half of the settlement from the special employer.
 

 The settlement entered into by AI and Ms. Fuentes was for future medical expenses. The record shows that all parties agreed to split the cost of an expert to create a cost projection for future medical expenses. Based upon Ms. Fuentes’ life expectancy of 38 years, there was a projection of $45,395 in routine physician visits, $11,666 for x-rays and lab work, $85,141.44 for medication, and $252,622 for a lifetime total if a spinal 119stimulator is used. Correspondence between the various attorneys shows that Ms. Fuentes would likely not consider having the spinal cord stimulator implanted. Without this element, her lifetime medical expense projection was $142,202.44.
 

 The compromise settlement was for $120,000. In exchange for the settlement, Ms. Fuentes released not only AI, but also Cellxion/Gray. Cellxion/Gray participated in the settlement negotiations and paid a portion of the cost for the lifetime medical expense projection. Cellxion approved the settlement as Ms. Fuentes’ employer. Settlement was for all future medical expenses that might be due from both AI and Cellxion/Gray. The settlement was
 
 *1056
 
 not excessive and no real issue about fairness of the settlement amount has been raised. AI and Cellxion/Gray are solidarily liable for Ms. Fuentes’ RSD condition. Therefore, we find that AI is entitled to recover from Cellxion/Gray for one-half of the settlement proceeds paid to Ms. Fuentes. We reverse that portion of the OWC ruling to the contrary.
 

 CONCLUSION
 

 For the reasons stated above, we affirm that portion of the ruling by the OWC finding that the shoulder and wrist injuries were separate, denying Cellxion/Gray’s claim to recover amounts paid to Ms. Fuentes for CTS and ordering Cellx-ion/Gray to reimburse AI for all benefits paid to Ms. Fuentes arising from CTS. We also affirm that portion of the judgment finding that the RSD is attributable to both the shoulder and wrist injuries and ordering Cellxion/Gray to pay one-half of the medical, indemnity and vocational rehabilitation benefits arising from it. We reverse that portion of the OWC’s | ¡^judgment denying AI’s claim for one-half of the compromise paid to Mr. Fuentes for future medical expenses. In addition to the amounts the OWC ordered that Cellx-ion/Gray was to pay AI in the judgment below, we order Cellxion/Gray to pay AI $60,000, representing one-half of the compromise settlement for future medical expenses. Costs in this court are assessed to Cellxion/Gray.
 

 AFFIRMED IN PART; REVERSED IN PART; RENDERED.
 

 [1]
 

 . Cellxion has a $50,000 deductible with Gray.
 

 [2]
 

 . Paresthesia is defined as morbid or perverted sensation; an abnormal sensation, as burning, prickling, formication, etc.
 
 DORLAND'S ILLUSTRATED MEDICAL DICTIONARY,
 
 pg. 1139 (25th ed. 1974).