WILLIAMS, J.
| Claimant, James Dow, appeals the workers’ compensation judge’s decision, finding that claimant failed to meet his burden of proving that his disabling condition was the result of his work-related injury. For the following reasons, we affirm.
FACTS
Claimant, James Dow, was employed by United Parcel Service (“UPS”) for over 33 years; he was planning to retire effective May 29, 2009.[1] Claimant was injured on April 14, 2009, when he struck his head on a loading-dock door as he was making a delivery. The parties stipulated that claimant was injured in a work-related accident.
On the day of the accident, claimant was examined by Dr. Ronald Woods at the Glenwood Family Practice and Occupational Health Center. Claimant complained of pain in the right side of his head and dizziness. Dr. Woods diagnosed claimant with a “contusion to skull” and ordered a computerized tomography (“CT”) scan of the brain; he instructed claimant to return to the clinic and await the results of the CT scan. Although the results of the CT scan were normal, Dr. Woods instructed claimant to wait in the clinic to ensure that he was “neurologically stable” before sending him home. Dr. Woods noted that claimant still complained of a headache and that he had been given ibuprofen for pain.
On that same night, claimant went to the emergency room at Glenwood Regional Medical Center (“Glenwood”), complaining of headache, dizziness and neck pain. Claimant’s physical examination was |2normal and did not reveal any laceration, hematoma, abrasion or swelling to the right side of his head. However, another CT scan was ordered; the results were normal. The emergency room physician diagnosed claimant with “concussion” and *38 discharged him with prescriptions for Flexeril (a muscle relaxant) and Lortab (a narcotic pain reliever) and with instructions to “followup” with his primary physician.
Claimant was seen by Dr. Woods the following day. Dr. Woods noted that claimant continued to complain of “some right temporal headache and some right neck pain.” Claimant’s neurological examination was within normal limits. Dr. Woods diagnosed claimant with a concussion and advised him “to take it easy all this week and even over the weekend.”
Claimant returned to the clinic on Friday, April 17, 2009. Dr. Woods noted that his condition was “improving” and that he complained of less pain. Later that day, claimant returned to the emergency room at Glenwood, complaining of nausea and “right[-]sided headache[,] ongoing intermittently since [TJuesday.” Claimant was given Benadryl, Toradol and Compazine; he was discharged home with a prescription for Fioricet as needed for pain.
On Monday, April 20, 2009, claimant returned to Dr. Woods and reported that he had “almost constant pain in the right temporal area of his skull and behind his eye[,] radiating to the back of his head almost down to his neck.” Dr. Woods examined claimant and noted that he appeared to be neurologically stable. Dr. Woods prescribed Tylenol # 3 for pain and Toradol injections as needed for severe headaches. He placed claimant on “clerical work only this week,” and ordered a magnetic resonance imaging |3(“MRI”) scan which showed “sinusitis.” Dr. Woods examined claimant on several other occasions: April 24, April 30, May 7, and May 26, June 3 and June 10, 2009. By the end of May, claimant’s complaints included headache and pain in the back of his neck. On June 3, 2009, Dr. Woods noted that claimant “has less pain in the temporal area but increased pain in the back of his neck.” He diagnosed claimant with post-concussion syndrome; at claimant’s request, Dr. Woods referred him to a neurologist.
Claimant retired from UPS on May 29, 2009. He began receiving workers’ compensation indemnity benefits from May 29, 2009, until his benefits were terminated on March 31, 2010.
On June 29, 2009, claimant was examined by a neurosurgeon, Dr. Howard Hola-day, who noted that claimant had “post-traumatic headache” with a normal neurological exam. ' Dr. Holaday prescribed Ly-rica, a pain medication, and instructed claimant to return with copies of his prior CT and MRI scans for his review. On July 15, 2009, claimant returned to Dr. Holaday, complaining of “intermittent headaches, pain over the right temporal region, and some pain affecting the right side of the neck and the right periauricular region.” Dr. Holaday prescribed pain medication and physical therapy, and ordered an MRI of the cervical spine and CT angiograms.
On July 21, 2009, claimant underwent an MRI of the cervical spine and CT angio-grams of the head and neck at Ouachita Imaging Center. The MRI showed a “broad base left paracentral disc protrusion at C6-7, producing some mild left lateral spinal stenosis.” The CT angio-grams were [ unremarkable.
On July 30, 2009, claimant returned to Dr. Holaday for a followup visit and reported “little change in his symptoms.” Dr. Holaday noted that claimant’s MRI and CT results did “not correlate with the distribution of his symptoms.” Dr. Hola-day continued to treat claimant conservatively, opining that he would not benefit from additional neurological intervention *39 and referred him to Dr. Carroll McLeod for pain management.
Claimant returned to Dr. Holaday on August 26, 2009, reporting “no significant change in his symptoms.” Dr. Holaday noted, “I do not believe the patient would benefit from any neurosurgical intervention at present,” and again referred him to pain management.
On October 19, 2009, at the request of UPS, claimant underwent what is referred to as an independent medical examination (“IME”)[2] by Dr. Mary McWilliams, a neurologist. Dr. McWilliams characterized claimant’s injury as a “slight bump or blow to the head.” She noted that claimant had no objective findings which would be consistent with head trauma. She reviewed claimant’s MRI results and opined that the lesion in his spinal cord was not the type of lesion normally seen in trauma. Dr. McWilliams also reviewed claimant’s medical history and opined that claimant’s spinal issues were not related to his work-related accident, but rather, to degenerative disc disease and physiological stress. Dr. McWilliams noted:
Although the patient does not have objective evidence of a chronic injury from his bump to the head, he does have objective evidence of [a] chronic c-spine condition that | smay be painful. Generalized degeneration of the spine is an age related problem that can become symptomatic at any time in life[.]
[[Image here]]
The herniated disc in the lower cervical spine is an asymptomatic lesion before and after the blow from bumping the door. It could not be causally related due to the location of the lesion in relation to the blow.
[[Image here]]
The patient would be most safely treated using modalities such as ice, heat, and massage than with long term medications.
[[Image here]]
The objective findings in the medical record support a diagnosis of contusion to the scalp over the left ear. There is nothing in the medical record that supports a diagnosis of cerebral concussion and the severity of the blow was mild. Treatment with occasional analgesics is appropriate for the symptoms he complains of.
[[Image here]]
More likely than not the only part of the pain directly related to the accident is the scalp pain. This is intermittent but can be severe for a few seconds off and on.
[[Image here]]
These symptoms would ordinarily be over in 4-5 months. This time has passed since the accident and the patient is still complaining of the same pain. However, he does admit that it is less frequent and less severe than it was initially.
[[Image here]]
In summary, all of the patient’s symptoms cannot be attributed to a condition caused by this accident. However, the patient may have lingering pain from this seemingly trivial event due to previously less symptomatic degenerative conditions of his spine. There is no objective evidence to support a serious *40 injury from this mild contusion and certainly no evidence of injury to brain, spinal cord, or nerve root. There is potential for reversible injury to peripheral cutaneous nerve terminal segments in the scalp.
On December 14, 2009, claimant was examined by Dr. Carroll McLeod, an anesthesiologist at the Jackson Pain Center. Claimant’s chief complaint was right posterior neck and scalp pain, right ear pain and | ^occasional right parietal pain. After reviewing claimant’s MRI, Dr. McLeod diagnosed him with right-sided occipital neuralgia and headaches, status post-work related injury. Dr. McLeod performed a right occipital nerve block[3] and fitted claimant with a muscle stimulator. ■ He prescribed Darvocet-N 100 as needed for pain.
On December 18, 2009, Dr. McWilliams, the employer’s chosen physician, issued a supplemental report, stating:
The patient is able to work, but should not lift objects greater than 25 pounds due to the herniated disc in his lower cervical cord.
Although he contends that pain medication “knocks him out” this is merely an indication that the prescribed dose of medication has been inappropriately high or the wrong medication has been used. There is always a therapeutic window for pain control below the level of sedation.
The problem is an aging change in the patient’s spine and may was [sic] not aggravated by his on the job accident as it never became symptomatic and would not have been an expected complication of bumping his head. These restrictions would have been indicated if he had never had an accident.
On January 18, 2010, claimant returned to Dr. McLeod for a followup examination. Dr. McLeod noted claimant continued to take “some occasional Darvoeet” but had an “overall about 40% to 50%” improvement. On February 18, 2010, Dr. McLeod reported that claimant was “overall markedly improved. In fact, most of the significant pain has resolved.” However, he noted that claimant had requested “something stronger than his Darvoeet.” Dr. McLeod prescribed Norco 10/35 to be taken as needed for |7pain. He also prescribed Am-rix, as needed for muscle spasms. On March 11, 2010, Dr. McLeod described claimant as “much improved,” He noted that claimant was “still having little pain and some occasional headaches over the right occipital area [and] some mild spasm.” Dr. McLeod placed claimant on Lyrica and instructed him to “start taking his Amrix on a regular basis.” He also instructed claimant to “continue using his hydrocodone” as needed for pain.
On March 30, 2010, claimant returned to Dr. McLeod, who noted that claimant was “markedly improved,” with only “mild tenderness to palpation over the right occipital nerve at the right occipital groove[.]” Dr. McLeod opined that claimant had reached maximum medical improvement and could return to his previous job, “since he was basically a driver and in the office.” He recommended continued medication and intermittent followup for possible nerve blocks. However, on April 20, 2010, Dr. McLeod penned a letter, addressed “To Whom It May Concern,” stating:
Mr. Dow last saw me on 03/30/2010. At that time, we completed his therapy. I had told him that I thought he could probably return to work. This was based on a previous note by Dr. Hola-day. However, he is going to see Dr. *41 Holaday for a second opinion. I will defer his work status to Dr. Holaday.
Claimant returned to Dr. Holaday for a followup visit on April 21, 2010. Dr. Hola-day noted:
The patient returns today for routine followup and review since undergoing a series of occipital nerve blocks performed by Dr. McLeod. He reports some improvement in his symptoms. He continues to complain of chronic and intermittent pain. The patient has had a thorough course of conservative treatment and has no focal neurological findings. I do not believe he | swouId benefit from any additional neurosurgical intervention. I believe he has reached maximum medical improvement. I would not place any specific restrictions on his activities.
[[Image here]]
I do not believe the patient has any permanent impairment as a result of his injury.
Consequently, as noted above, claimant’s workers’ compensation benefits were terminated as of March 31, 2010.
On May 11, 2010, Dr. McLeod referred claimant to physical therapy to “evaluate and treat, [for] two weeks at three times a week.” Claimant returned to Dr. McLeod on July 20, 2010, with continued complaints of headaches and occipital nerve neuralgia symptoms. Claimant also reported that he was having difficulty tolerating his medication. Dr. McLeod prescribed Rybix ODT, a non-narcotic pain reliever, and instructed claimant to follow up with him as needed.[4]
Following a visit on December 14, 2010, Dr. McLeod noted that claimant was “overall improved.” He maintained the Rybix ODT medication and recommended that claimant follow .up “in a .couple of | nmonths or on [an as needed] basis.”
On February 3, 2011, claimant returned to Dr. McLeod, reporting a “flare” of pain. Claimant also reported an intolerance to pain medication, including the Rybix ODT. Dr. McLeod recommended another series of occipital nerve blocks and prescribed Zipsor, an anti-inflammatory medication. Dr. McLeod noted:
I am going to hold his work restrictions for now. I do not think he can go back to work at'this time; however, I do hope this will be temporary as we [were] able to get it to resolve in the past, and Dr. Holaday felt that after we were able to get it resolved that he could return to work. However, at this present time, I do not think he could be gainfully employed given the fact that he is having *42 these ongoing headaches and we will hold the restrictions for now.
Claimant returned to Dr. McLeod on March 10, 2011, for a nerve block. Dr. McLeod noted that claimant was “still tender to palpation over the right occipital nerve at the right occipital groove[.]” He did not make any changes to claimant’s medication and instructed claimant to follow up “in three to four weeks for repeat occipital nerve block and trigger point injections.” Claimant returned to Dr. McLeod for a nerve block. Dr. McLeod continued the Zipsor medication and noted that claimant could “resume his regular activities beginning tomorrow.”
On March 11, 2011, claimant filed a disputed claim for compensation, alleging that he was temporarily totally disabled. Claimant also requested penalties and attorney fees “for failure to reinstate weekly benefits despite the treating physician recommendation not to work.”
In response, UPS and its insurer, Liberty Mutual Insurance Company, |inffled an answer admitting that claimant had been employed by UPS and that he “sustained an on-the-job accident while in the employ of UPS.” However, defendants asserted that “certain conditions claimed by the applicant are the result of other injuries or causes not associated with his employment nor were any said conditions aggravated by employment at UPS.” In the alternative, defendants alleged that “if any condition resulted from [claimant’s] employment, that [claimant] has recovered from any such injury and condition, and any alleged disability which he has is the result of degenerative processes or other injuries or illnesses, which ai-e not related to his employment, nor were these conditions aggravated by his employment activities.”
On April 20, 2011, claimant was seen by Dr. McLeod, who noted that claimant was “overall much improved. He is about 70% improved from baseline.” Claimant was given a right occipital nerve block and a prescription for Zipsor. Dr. McLeod noted, “He can resume his regular activities beginning tomorrow.”
On June 2, 2011, claimant returned to Dr. McLeod, continuing to complain of pain over his right greater occipital nerve at the occipital groove. His examination revealed tenderness in that area. He received an occipital nerve block and was instructed to follow up with Dr. McLeod on an as needed basis.
On June 16, 2011, claimant presented to the emergency room at Glenwood, complaining of neck and back pain. Claimant was given a Toradol injection and was released with a prescription for Ultram as needed | nfor pain.
Claimant returned to Dr. Holaday on July 13, 2011, for a routine followup. Dr. Holaday noted:
He has completed a series of injections performed by Dr. McLeod. He indicates that they were not effective in alleviating his symptoms. He complains of chronic and intermittent posterior cervical and occipital pain. I believe his symptoms are likely secondary to cervical spondylosis — exacerbated by his job injury.
[[Image here]]
I do not believe he would benefit from any surgical intervention. I believe he has reached maximum medical improvement.
[[Image here]]
I believe he has a 5% whole person impairment. I would not place any specific restrictions on his activities.
On September 19, 2011, claimant was examined by a physician of his choice, Dr. Reynard Odenheimer, a neurologist, in Lake Charles, Louisiana. Claimant pre *43 sented complaining of persistent radiating pain to the right side of his head, neck and shoulder since the work-related accident. Claimant also reported that the pain had begun to radiate to his right arm. Dr. Odenheimer’s impressions were: • status post-head trauma, headaches, neck pain, tremors, sleep disturbance, mood disturbance, neuralgia, spasm and hypertension. He performed an occipital nerve .block and prescribed Valium and a “therapeutic trial of Baclofen 10 mg.”[5]
Dr. Odenheimer also ordered another MRI of the brain and cervical spine, which was completed on September 26, 2011. Claimant’s MRI showed the following: “chronic disc disease mainly at C5-C6 and C6-C7[,]” and a “large central left para-central disc protrusion at C6-C7 having mass | ^effect upon the cervical cord ... having increased in size since the prior exam from approximately 2 years earlier.” Claimant’s MRI of the brain showed “diffuse mild involutional changes noted with evidence of mild chronic microvascular ischemia but no acute intracranial findings identified[.]”
On October 19, 2011, claimant returned to Dr. Odenheimer for a followup visit. Dr. Odenheimer’s impressions included head trauma, spastic hemiparesis, spasticity, spinal stenosis, neuralgia, medication intolerance and medication intoxication. He advised claimant that he should not drive if he was having any side effects from the medication. Dr. Odenheimer continued the Valium and Baclofen and ordered a short-term use of Prednisone, a steroid. He referred claimant to Dr. Anil Nanda, a neurosurgeon at LSU-Shreveport.
On November 2, 2011, defendants referred claimant back to Dr. McWilliams for another IME. Dr. McWilliams examined claimant on ' November 16, 2011. During this visit, claimant reported that he had retired and that the accident occurred one month before he was scheduled to retire. Claimant also ■ reported a poor sleeping pattern and progressive pain in his neck and head, which limited his level of activity. Dr. McWilliams examined claimant and did not make any objective findings related to claimant’s accident at work or any deterioration in claimant’s cognitive function. Dr. McWilliams issued a report, stating, in part:
[Mjyelopathy in [rjight upper extremity; occasional numbness in his right hand. No sign of peripheral neuropathy. Frontal lobe deficits possibly connected with forceful blow to head. Likely complicating factor is haSleep Apnea Syndrome. This patient needs further evaluation for sleep apnea as this is correctable and may be the cause of his cognitive symptoms and headaches. Patient is somewhat impaired due to his coronary artery disease and focal mye-lopathy, but appears able for light work or sedentary work that is within the limits of his cognitive symptoms. His problems may be of greater magnitude than anticipated from a short interview due to the possibility of a sleep disorder the severity of his symptoms may vary widely from one part of the day to the next. Sleep apnea is treatable and in some cases curable with weight loss or oropharyngeal surgical procedures.
Claimant returned to Dr. Odenheimer on December 7, 2011. Claimant reported that his “neck hurts again” and that the “Prednisone helped briefly.” Based on claimant’s examination, Dr. Odenheimer’s impressions were: head trauma, spastic hemiparesis, spinal stenosis, neuralgia, medication intolerance, spasticity and occipital neuralgia. He continued claimant’s *44 other medications, but added a prescription for Lortab to be taken as needed for pain. On January 4, 2012, claimant returned to Dr. Odenheimer complaining of “an increase in pain.” ■ Dr. Odenheimer re-referred claimant to Dr. Nanda “to evaluate and treat cervical stenosis, myelopathy, and occipital neuralgia.” He prescribed a “therapeutic trial of Talacen,” a pain medication, and ordered another MRI. The MRI, completed on February 9, 2012, showed that claimant had “2 level degenerative disc disease most severe at C6-7 with prominent left paracentral protrusion. Minimal changes noted from studies in 2011.”
On February 15, 2012, claimant returned to Dr. Odenheimer for a followup visit. Claimant continued to complain of pain and reported that he had “difficulty getting comfortable at night due to his neck pain and 114neuralgia and headache.” Dr. Odenheimer stated that he was awaiting claimant’s appointment with the neurosurgeon. He also stated, “Given side effect of medication and nature of medications required for comfort and quality of life, feel that the patient is likely unemployable as an equipment operator or commercial driver.”
On April 19, 2012, claimant was examined by Dr. Nanda, the neurosurgeon, who was asked to consider a nerve stimulator for the treatment of claimant’s neuralgia. Dr. Nanda reviewed the MRI but declined to perform any surgery due to claimant’s prolonged use of narcotic medication, the length of time claimant had been experiencing symptoms and claimant’s cardiac problems.
On April 28, 2012, claimant returned to Dr. Odenheimer, complaining of “pain in the right posterior occipital head and neck region, as well as pain between his right scapula and his back.” Claimant also reported that he had abruptly stopped taking his medication after being encouraged to attempt to taper off the medication. Dr. Odenheimer advised claimant to resume the Talacen and Valium at a reduced dosage to prevent withdrawal symptoms. Dr. Odenheimer administered an occipital nerve block and prescribed Talacen, Valium and Flexeril.
Claimant testified that he did not have any symptoms of pain prior to his injury at work. He denied having any headaches or neck pain. Claimant also denied having any knowledge of the herniated disc in his neck prior to the accident. He stated, “[T]o my knowledge, I’ve never went [sic] to a doctor for neck injury.” He also testified that he was not taking any |,¿medication for pain before the accident; however, he has been on some form of narcotic pain medication ever since the accident. Claimant further testified that prior to the accident, he worked “eight and a half to nine, nine and a half hours a day, every day.” He also testified that he operated a small engine business from his home prior to the accident. He stated that he had planned to continue to operate the business after retirement to supplement his income. He stated that he is able to assist his wife at the shop “maybe two or three days a week ... three to four hours a day[.]”
Claimant’s wife, Eyvonne Dow, also testified at the trial. She stated claimant did not have any problems with headaches or neck pain prior to the accident. She testified that since the accident, claimant has been “hurting in the back of his head and down into the neck.” Mrs. Dow also testified that since the accident, claimant “hasn’t been able to do like he normally would do. He hasn’t been able to enjoy his life.” She stated that claimant now relies on pain medication “just to be able to bear the pain to be able to just do little stuff in life.”
*45 At the conclusion of the trial, the workers’ compensation judge (“WCJ”) denied the claim for workers’ compensation benefits, stating:
Claimant has failed to establish he is unable to earn at least ninety percent of his pre-accident wage due to the injury sustained on April 14, 2009. Claimant retired from the workforce effective May 29, 2009. He testified that he signed documents for his retirement in January, 2009. He had a lawn mower business he transferred to his wife. He planned to work in that business to supplement his income. He is unable to work, according to him, as a commercial driver due to the stress on his neck. He is taking medications that prevent him from driving and he is unable to lift heavy objects.
[[Image here]]
|1fiI placed emphasis on the fact that [Dr. McWilliams] found if claimant did not have changes in his neck, heart disease, a problem sleeping, and only had the bump on his head, he would be able to return to work.
I further note that Dr. Carroll McLeod thought claimant to be at maximum medical improvement. He could return to his previous job as a driver.
* ⅝ *
There’s a lack of evidence that the numerous complaints suffered by claimant are work related. There’s a lack of evidence that any of the medications preventing him from returning to the work environment is medication required as a result of the work related accident and not the result of other health problems suffered by claimant. There is a lack of evidence that his injury resulted in his inability to earn ninety percent of his wages.
There is a lack of evidence that claimant is unable to earn ninety percent of his pre-injury wages because — emphasis placed on the word, because, — of the work related injury.
* * *
Claimant now appeals.
DISCUSSION
Claimant contends the WCJ erred in finding that he failed to meet his burden of proving that his continued neck and back problems are the result of his work-related injury. He also contends the WCJ erred in concluding that he failed to prove that. the pain medications prescribed to him were necessary to treat a work-related injury. Claimant argues that UPS has never contended that he did not suffer a work-related injury; therefore, causation was not an issue. According to claimant, the issue is whether he is able to earn 90% of his average pre-injury wage.
An employee is entitled to workers’ compensation benefits if he receives a personal injury by accident arising out of and in the course of his | I7empIoyment. LSA-R.S. 23:1031(A); McLin v. Industrial Specialty Contractors, Inc., 2002-1539 (La.7/2/03), 851 So.2d 1135. A workers’ compensation claimant has the burden of proving, by a preponderance of the evidence, that the disability suffered is related to an on-the-job injury. Modicue v. Graphic Packaging, 44,049 (La.App.2d Cir.2/25/09), 4 So.3d 968; Taylor v. Columbian Chemicals, 32,411 (La.App.2d Cir.10/27/99), 744 So.2d 704. The causal connection between the disability and the on-the-job injury can be established when the employee proves that before the accident he was in good health, but commencing with the accident the symptoms of the disabling condition appeared. Scott v. Super 1 Foods, 45,636 (La.App.2d Cir.9/29/10), 48 So.3d 1133; see also Po *46 land v. Kroger, No. 404, 32,576 (La.App.2d Cir. 12/8/99), 747 So.2d 711, writ denied, 2000-0583 (La.4/7/00), 759 So.2d 764.
The purpose of supplemental earnings benefits (“SEB”) is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident. Poissenot v. St. Bernard Parish Sheriff’s Office, 2009-2793 (La.1/9/11), 56 So.3d 170; Roach v. Libbey Glass, Inc., 47,573 (La.App.2d Cir.11/14/12), 107 So.3d 759. An employee is entitled to receive SEB if he or she sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his or her average pre-injury wage. LSA-R.S. 23:1221(3)(a).
As stated above, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. | Poissenot, supra; Roach, supra. In determining if an injured employee has made out a prima facie case of entitlement to SEB the court may, and should, take into account all those factors which might bear on an employee’s ability to earn the appropriate wages. Id. Only when the employee makes this initial showing does the burden shift to the employer to prove that the employee is physically able to perform a certain job and that the job was offered to the employee in his or the employer’s community or reasonable geographic area. Id.
Moreover, in a workers’ compensation case, as in other cases, the appellate court’s review is governed by the manifest error or clearly wrong standard. Fuentes v. Cellxion, Inc., 44,914 (La.App.2d Cir.12/16/09), 27 So.3d 1045; Gilbert v. Willis-Knighton Workkare Clinic, 44,628 (La.App.2d Cir.9/2/09), 20 So.3d 1149. Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the Office of Workers’ Compensation (“OWC”) judge. Id. Unless shown to be clearly wrong, the trial court’s factual findings of work-related disability will not be disturbed where there is evidence which, upon the trier of fact’s reasonable evaluation of credibility, furnishes a reasonable, factual basis for those findings. Id. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id.
When there are two permissible views of the evidence, a factfinder’s | ^choice between them can never be manifestly erroneous or clearly wrong. Winford v. Conerly Corp., 2004-1278 (La.3/11/05), 897 So.2d 560, citing Stobart v. State, 617 So.2d 880 (La.4/12/93) and Sheppard v. Isle of Capri, 40,048 (La. App.2d Cir.8/17/05), 909 So.2d 699. Thus, even when the appellate court is convinced it would have weighed the evidence differently had it been sitting as trier of fact, the court of appeal may not reverse if the factfinder’s findings are reasonable in light of the record reviewed in its entirety. Id.
In the instant case, it is undisputed that on April 14, 2009, claimant sustained an injury while he was at work. Thus, the existence of a work-related injury has been established in this case. What is in dispute is whether claimant met his burden of proving that the work-related injury caused his inability to work because of his subsequent head, neck and back pain.
During the trial, both claimant and his wife testified that claimant did not suffer from neck and back pain prior to the accident at work, and he was not taking any medication for pain before his accident. *47 Claimant testified that at the time he was released to return to work, he was still on narcotic medication, which prohibited him from driving commercially. Claimant also testified that he has been on some form of narcotics or pain medication since the accident.
Defendants presented ample evidence which discredited and cast serious doubt upon claimant’s assertion that his continued headaches, neck pain and back pain were caused by his work-related accident. The WCJ, as 12nthe trier-of-fact, heard the testimony and reviewed the depositions and claimant’s medical records. The WCJ expressly concluded, “There’s a lack of evidence that the numerous complaints suffered by claimant are work related.” We find no manifest error in the WCJ’s findings.
Although there is conflicting medical evidence as to the cause of claimant’s head and neck pain, the evidence supports the WCJ’s conclusion that claimant’s persistent symptoms were not attributable to his accident at work. The WCJ stated, “I placed emphasis on the fact that [Dr. McWilliams] found if claimant did not have the changes in his neck, heart disease, a problem sleeping, and only had the bump on his head, he would be able to return to work.”
Additionally, in July 2009, Dr. Holaday noted that the results of claimant’s MRI and CT angiogram did “not correlate with the distribution of his symptoms.” Dr. McWilliams examined claimant for the first time in October 2009, and described his injury as a “slight bump or blow to the head.” She opined that claimant’s condition was related to degenerative disc disease and physiological stress, rather than to the work-related injury. Dr. McWil-liams also noted that claimant suffered a mild contusion to the scalp as a result of the accident. She opined that claimant’s symptoms “would ordinarily be over in 4-5 months.”
We have conducted a thorough review of this entire record, including the testimony evidence and claimant’s medical records. We must conclude that the WCJ did not commit manifest error in finding that claimant failed to prove that his disabling condition was caused by his work-related injury.
12i For the same reasons, we find that the record supports the WCJ’s conclusion that claimant is not entitled to SEB. Claimant argues that he is currently unable to operate a commercial vehicle due to his reliance on prescription pain medication to control his pain. However, claimant did not meet his burden of proving that his work-related injury resulted in his inability to earn 90% of his pre-injury wage. As stated above, the WCJ was persuaded by the medical evidence that the injury claimant sustained at work was minor, and that the subsequent medical issues and treatment were unrelated to his work injury. This assignment lacks merit.
Because we conclude that the WCJ was not manifestly erroneous in finding that claimant failed to meet his burden of proving he is entitled to SEB, we need not consider his argument that the WCJ erred in finding that he intended to withdraw from the workforce when he retired in May 2009.
CONCLUSION
For the foregoing reasons, we affirm the WCJ’s judgment dismissing claimant’s workers’ compensation claim. Costs of this appeal are assessed to claimant, James Dow.
AFFIRMED.

. On March 9, 2009, claimant formally notified UPS of his intent to retire.

. The examination was actually based on a request by UPS for claimant to see its doctor. The WCJ did not order an IME.

. Dr. McLeod administered a series of nerve blocks and trigger point injections: December 14, 2009, January 18, 2010, February 18, 2010, March 10, 2011, and April 20, 2011.

. Additionally, Dr. McLeod noted that claimant informed him a friend, who had a similar condition, recommended that he see an ear, nose and throat ("ENT”) specialist. Dr. McLeod expressed his doubt that claimant’s condition could be treated by a specialist in that discipline. Nevertheless, he informed claimant that if his case manager approved, he "would be happy to set it up." Dr. McLeod further stated, “I want this understood that I am not recommending that he see an ENT physician, but that if this is the desire of the patient and his Worker’s Compensation case manager that this would be my recommendation.”
On November 15, 2010, claimant was seen by Dr. C. Michael Osborne at Mississippi Ear, Nose & Throat Surgical Associates in Jackson, MS. Claimant complained of decreased hearing in his right ear, which he attributed to his work-related injury. Dr. Osborne noted, “I have discussed with Mr. Dow that I do not feel this trauma has contributed to his hearing loss. This appears to be symmetric in nature and therefore related to noise exposure over many years' duration.” However, Dr. Osborne wrote a letter to Dr. McLeod stating, in part, “At this point, I do feel the sensorineural hearing loss is related to his accident. I do feel that he would benefit from bilateral amplification^]”

. Baclofen is a muscle relaxant used to treat pain, muscle spasm and stiffness.